Next cases are VOTER VERIFIED v. PREMIER ELECTION SOLUTIONS in DBOLD, 2011-15-53 and VOTER VERIFIED v. ELECTION SYSTEMS and SOFTWARE, 2011-15-59 and as counsel both know we are combining these two since we have the same patent and the same counsel and although we have different defendants we have the same counsel so you may take 30 minutes each side and deal with them as you wish. Mr. Provotola. I am pleased to court. My name is Anthony Provotola and I am counsel for VOTER VERIFIED and I am everything else in relationship to VOTER VERIFIED too. The inventor, the applicant, the patent holder was until assignment to VOTER VERIFIED. The matter before the court today is the second appearance. The first appearance was in connection with the petition for mandamus and prohibition. Mr. Provotola, you have raised 14 issues. 14 issues, that sounds like just a splattering, let's see what sticks. You've got serious issues like infringement and validity. Why don't you focus on those two key issues? I would be happy to sir, yes. First of all there is no dispute as to any material facts in this case. Both parties have said that and they agree and the only record that is before the court is by way of affidavit. None of the depositions have been filed with the court that were taken. They were only depositions of myself and my other co-inventor as well as another patentee or I think a licensee. Let's focus on infringement of say a system patent. It requires a ballot selection, ballot scanning means. Yes your honor. And means plus function means defined infringement that means must be utilized by the defendant or an equivalent corresponding means. Exactly. Am I incorrect when I look at specification column 3 and find that it's a machine, a ballot scanning machine is an electro-sensing device and you're arguing that a human is an equivalent to that? Not to the purpose of section 112 paragraph 6. Isn't that a means plus function? Absolutely. It's a means plus function claim. And that's interpreted under 112.6. Exactly and therefore there has to be a corresponding structure specified in the patent application and so on was. And that's a machine? That was a machine under 112 paragraph 6. Is that being used by the defendants? No, except for another situation. See there are actually three products here your honor. The first one is in the premier case, okay, which is the AccuVote system. The second two, the second of the other two products, one is the, I think it's called the Ivotronic RTAL and that is similar to the one, the AccuVote. But then there is the Automark which is in the, of course in the ES&S patent, ES&S product. Does that use a machine? Yes, it does. As a matter of fact, their affidavit shows that that machine is designed to read a printed ballot and show the, show the votes in it, in a display. And therefore it's stored in the, temporarily in the AccuVote itself. So, so with respect to the Accu, I'm sorry, it's stored in the, in the Automark itself. So those, those are three different products, two of which are similar and do not use a machine, granted. However… Well the ones that don't use a machine, therefore do not infringe, isn't that right? Literally they do not infringe. And how can a human be equivalent to a machine and therefore they don't infringe the DOE either? Under the doctrine of equivalence. That is to say, they are equivalent. A human being who reads the, reads the ballot and examines it… May a human being be a means? Well, the question is, a human being is not a means under 112 paragraph 6, but a human is an equivalent. The human action of reviewing the ballot, reading the ballot and comparing it, that human action can be equivalent to what a machine does. Let me just flip something for you in this regard. If one were to apply for a patent on the basis of the computer performance… Professor, are you familiar with our case in default proof credit card systems? You said a human being cannot constitute a means. Yes, I am, thoroughly. And if I may expand on that, what default proof said is that a human being cannot constitute a means with respect to the mental activity that it provides. In other words, default proof zeroed in particularly on the fact that there was an unpatentable aspect to that case. In terms of the mental activity performed by the patent. But it was only under the 112 paragraph 6 question as to whether or not it was a proper means plus function claim. That was the whole issue in default proof. And indeed, it's not a question of simply human means, it's a question there of whether intellectual activity can provide the means. And there it said it cannot. No question about that. In addition, default proof based itself, although I mean, I'm sure default proof on its facts is correct. The point is that it referred to human means or didn't refer to human means as such. It essentially referred to other cases that involved attempts to patent intellectual activity, mental processes. That's the word I've been looking for. Why aren't the method claims invalid over Benson? Benson is not a proper. There are two questions there, if you please, Your Honor. One question is, is Benson proper prior art? And it is not. Why not? Because it was not publicly available in the process or under Lister. Lister established the criteria for that particular type of primary. Wasn't it discovered through the internet, just typing in keywords? Heaven only knows how it was discovered. We didn't learn about that except from the defendants when they opposed our motion for a summary judgment and put forth theirs. We were never informed about it under Rule 26 or anything else. But it did exist. It did exist. Yes, it did. You could access it by just keying in key phrases or key words and you could get that. No proof to that effect? The only proof to that effect is shown from a declaration, again another witness that they just popped up with, of this Mr. Marshall. I can't remember his name entirely. Maintainer? Excuse me? Marshall Maintainer? The Declaration of Maintainer? The Declaration of Site Maintainer. Right. First of all, the site itself was never a website. But that's neither here nor there. It was a dial-up database. But nevertheless, the Declaration of Marshall stated that he indexed the database when he put the database online. The database went online on a website that he devised the name for, some cutesy name of Catalyst UK. Now, this is where that information resided in this Catalyst UK website. Was it private or could anyone find it? Excuse me? Was it private or could anyone find it? Well, I don't know how anyone could find it. Someone did. Huh? Before us. Yeah. We were protected. I don't know anything about that aspect of the website. But for sure, no one found it until our motion for summary judgment. It wasn't found. Excuse me? How can you say that? Oh, I can't say that. No one found it. It wasn't put forth in the Rule 26 disclosures.  That's my only context, Your Honor. Granted. Isn't the implication of your argument that as we gradually move from libraries to online access of references that FireRock will necessarily diminish if it's only available online? I would like to, if you could, just re-establish that question for me, Your Honor. I would like to answer it. I was suggesting if you're saying that this is only online and therefore not publicly available. Oh, no. I'm not saying that at all. You're not saying… No, no. What I'm saying is it was not publicly available because you couldn't find it. You couldn't search it online. You couldn't search it from any of the databases that are used by the Patent Office. You couldn't search it on Dialog. It didn't exist as any information. Remember, they're saying this… Didn't Lindsay Marshall say, and there's evidence in the record, that he maintained public accessibility to the Risk Digest and gave a website, and he says he's done that since 1995. It was a website since 1995 under Catalyst UK. That's the only way it could be accessed. Who knows what Catalyst UK contains? Well, somebody does. Certainly, Mr. Marshall does. The point is that it existed. Yes, it existed, sure. And it was accessible. It was not publicly accessible because you couldn't find the Risk Digest or the Benson article by… Look, it was indexed within this website that had no rhyme or reason in its URL with the subject at hand. It's like a book that's completely mislabeled and put in a library. And in addition to that, given the library analogy, this is like a book in a library that has an index. Do we have any evidence in the record relating to the metadata that was used in the website so that it would be searchable in some fashion? No, there was no evidence presented whatsoever. The fact is that there is no evidence that it was publicly available under Lister. Lister establishes… There's an affidavit saying it was publicly available, and if you're saying it was improperly indexed, then don't you have to show us what the site's metadata said? No, it wasn't publicly indexed in the sense of availability through a standard database. It wasn't indexed at all. There's no proof that it was indexed. And the burden is on the defendant to show whether or not it was publicly available by clearing convincing evidence. And simply to say that the book had an index, their little secretly named website, Catalyst UK, had an index of its own. They've got an affidavit of the webmaster. That said it was on the website, Catalyst UK website. There was no website for Risks Digest, and there was no website for Computer Risks Digest, or anything of the sort. It was Catalyst UK. It's like a book in the library with an index, is all it is, improperly indexed in the card index. You can't find it. But in this case, I see what you're arguing. You're arguing that somebody looking at a website that's called Catalyst UK is not going to think that the Risk Digest is there. There's no association. In this day of information technology, you search and you put in keywords. You put in a keyword like Risk Digest. Just today? Yeah. This is 2000. Well, when was this case heard? This case was started in 2009. Okay. I mean, the infringement goes back six years to 2004. There's no proof that this was available at the time of this digest. I have no doubt that Mr. Marshall is saying the correct thing with respect to its presence on the web, but it's in a secret location, a location that's not associated with its content. I guess what we look at is whether it was accessible or not. Yes, that's correct. And the evidence on the record is that it was publicly available. That it was public. That it was accessible. Not in the context of Lister. Lister, which you probably are familiar with, made it very clear that there has to be some ability to search by the information that is sought directly from some database that is publicly accessible. That is not the case. It's a matter of fact. Mr. Profitola. Yes. Skipping to another one of the 14 issues that you've cited. Certainly. You said it was an abusive discretion for the trial court to have committed Diebold's answer, which was two days late. No doubt you've searched, you know our case law well. How many cases have you found where we have overruled a district judge permitting an answer that's two days late not to be admitted? Oh, I understand your point of view there entirely, Your Honor. It's not a point of view I have. I'm just reflecting the fact that it's not a winning argument, and so why is it thrown in here to dilute whatever sound argument you may have? It's not diluted at all, Your Honor. The problem is the way this case started off. The middle district has a rule, a local rule, that requires the plaintiff to apply for a default promptly. Well, that's fine, you know. The default occurred. I applied for it promptly. Did you call opposing counsel? There was no opposing counsel. There was no opposing counsel. Diebold had not entered an appearance. No one had showed up for Diebold at all on the render. Had anybody showed up for any other lawyer? Certainly did. Any other lawyer showed up? Yes, certainly did. And a higher extension had been granted, is that not? Mr. Harry O. Thomas called and asked for an extension for Premier and also asked for an extension for ES&S. My point is, why is it appealed here? Because there's no other place to go. We were sent this notice of filing which said, upon its arrival in the clerk's office, it was immediately referred to the magistrate. Now, how can that be? The clerk has a duty under 55A to immediately enter a default. What is this referral to the magistrate? That raised a lot of questions. Somebody was anticipating our filing this default. And so consequently, to answer your question about Mr. Thomas, I asked him specifically, do you represent Diebold? They haven't filed an answer. He says, I do not, and I'm not asking for one. That's in the record. I signed an affidavit that, in effect, I made that representation in my motions. That's the position I was in. They didn't come forth with any notice of appearance. Diebold, I think, if the record is examined, was in some sort of struggle with ES&S after having sold them Premier. Premier was sold to ES&S by Diebold. They were discussing who was going to provide representation. So what? They were discussing, we don't know what happened. We don't know what's happening between them. But it appears that they were fully aware of this deadline, and they were playing this game of chicken with this other company as to who's going to defend them. But an appeal brief isn't simply a recitation of everything that occurred in the trial court. It is a selection of issues on which you lost that you think you might win on. I must say, Your Honor, we received no consideration in the lower court on any issues. And why are you appealing sovereign immunity, recapture, mocking issues, which were held to be moot, when winning on those issues won't do you any good unless you win on validity and infringement? That's correct. But those weren't decided against you. They were decided to be moot when they were completely before the court in the lower court. They were before the court on two occasions. One of the occasions resulted in the magistrate, who was challenged on this default business, striking my motions for summary judgment on some sort of technical ground that didn't exist, at least in my opinion. So this is the question. We have had no real hearing before a court in this case. I have never met these judges in my life before this case. We weren't even permitted an oral argument before Judge Fawcett until the other side asked for reconsideration of a summary judgment that was granted against them. And that was only for 15 minutes, and that was only to allow them to present evidence, which they didn't present any evidence at all. So the difficulty is this is the first time I've faced a judge on these issues. Well, you've had three of them. Three of them, yes. Thank God. At any rate, we looked for – it was us, it was the plaintiff who filed the motions for summary judgment in the first place and said we want an up or down view of this. There are no disputants, any material fact in this case with respect to the infringement, especially of Claim 49. And that was the – we had to narrow down our motion for summary judgment in that regard. And so we asked – we concentrated on that at the outset. And they, of course, filed their cross motions with the same assertion that there's no dispute as to any material fact. Well, you do have plenty of time, and you can use it or save it. But do you want to let us hear from the other side and we'll save your time for rebuttal? Oh, fine. That would be all right. If your court has no further questions, there were a couple of things I just wanted to mention. And that is the – ordinarily you would give deference to the lower court in matters because they are close at hand and see the testimony. They're able to judge the character of the witnesses and so on and so forth, their credibility. None of that existed in this case. This is strictly on the CMECF system in terms of submitting documents and having the court review them. This is it. You might – this is not a – this is not a – the same cold case, if you like, that you have is the one that the lower court had. And there was no intimate knowledge of any outside information. I need to also point out that the – one last point that I would like to make at this juncture was that we really want a full review of everything in this case. It has – no – there's no one issue that is going to resolve this case. All of these issues, especially the discovery issue, no discovery was allowed whatsoever. There was an attempt, I think, to fake us out with this thing called a quick peek where we were required to travel 6,000 or 7,000 miles to look in their warehouse on a pallet with a bunch of – I don't know why. Yeah, it seems that the magistrate says that our motion for – to compel the discovery, to compel an adequate response to our request for production was granted. However, it was granted by sending us on free trips to various locations around the United States and in Canada to look at things on a pallet in a warehouse under a confidential – under a cloud of confidentiality. It's a method that's been developed over the years because of abuses of electronic discoveries. Well, no, the way that works is that you have two parties who don't want their stuff to become public, and so they agree to a quick peek – agree to a quick peek. They're trying to maintain each other's confidentiality. They have a vested interest in their own confidentiality. Well, that's fine. Anybody can agree to anything and carry that out. It can't be imposed in derogation of the rules of civil procedure where they just say, oh, no, now we're – the other side applied for protective orders, all of which was inadequate, didn't provide their tables, did nothing, didn't even do an investigation. The documentation said we will have to perform an investigation to comply. They didn't even perform an investigation at the time of this order. It was really a shambles to deal with this situation, and the only result was that we could not take the risk of having them dump a bunch of material on us that they claimed was confidential and expose us to the necessity of providing security for all that junk. We have no idea what they have or what they don't have because they never responded to our request for production at all. All they had was general objection. The law is clear. That waives all of their objections. They don't have any basis for protection at all. Shall we save the remaining five minutes? Yes. Thank you very much, Your Honor. Okay, Mr. Evans. Now, you've decided to save eight minutes for your prosecution. Yes, Your Honor. Of course, you'll have to decide now, but you don't know whether an appellant will be dealing with that issue. If she doesn't, you've got something to respond to, so we'll see. I don't think I'll be out much time, Your Honor. Right. Please don't deal with 14 issues. I won't deal with that either. I'll keep it to about four. Thank you, Your Honor. May it please the Court. Counsel. My name is Robert Evans, and I'm here on behalf of ES&S, Premier, and Diebold. And what I'd like to do is start with the issues that we cross-appealed and briefly sort of summarize those because I think they'll get a little bit of focus in this case. I'd like to start with the unasserted claim. When I say the unasserted claims, what I mean is throughout the case, throughout the closing discovery, the only claims that were ever asserted or ever put against a product were claims 49, 56, 85, 93, and 94. Weren't they all in the complaint? I'm sorry? Weren't they all in the complaint? The complaint alleged a patent as a whole. That is correct, Your Honor. But in terms of when we asked him in interrogatory and said, which ones do you contend are infringed, he just listed those five. And those are the only five. He only moved for summary judgment on one of them. That was claim 49. And so it's beyond those five. We submit that they were unasserted claims. And under the Ball, Arisal, and Jervis Webb case, we believe that when the Court entered an order finding them not invalid in some orders, invalid in other orders, that those were unasserted claims and we should vacate that order. Not say that they're invalid, but just say that no ruling on that because it was never litigated from the parties. After the close of discovery, for the first time, the plaintiff asserted claims 1 and 25 against some equipment. I think we got that from the brief. I want to control your argument. Why don't you deal with validity and infringement? Okay. And so we go straight to validity. Claim 49 and under Benson, claim 49 is basically directed to a standard electronic voting machine where it prints out a paper ballot. The voter is allowed to compare the ballot against the screen that shows how they voted. The language of the claim is that they have to, a decision by the voter as to whether a printed ballot is acceptable or unacceptable, and then inputting of information as the acceptability of the ballot, and then submission of an acceptable printed ballot for tabulation. Every single one of those steps is in the Benson Prior Art. Was that available, publicly available, accessible? We submitted the declaration of Christopher Butler. It's at appendix number A980, where in 1997, the Wayback Machine picked it up as being out there and available. So the Wayback Machine is the Internet Archive that goes out, searches the Internet, and finds all the things that are publicly available, and organizes them by date and time to let you know what was available at that window, that snapshot. So what are the search terms? Voting machines? The search terms for the Internet Archive I don't believe are anything. I believe it's just a broad search that searches everything that's out there publicly on the Internet, and I don't know how it works exactly. Did it find the Risk Digest or the actual Benson publication? Well, the Benson was inside of the Risk Digest, and what he found was the site that carried the Risk Digest. What's your reference to that appendix again? That was A980 to 983. So he found the site, but not the actual publication? I don't know that he indexed everything that was in the site. I know that if you go in the Wayback Machine and pull it up, you can see the site. You can pull up materials inside the site, and I believe attached to it. Yes, he did pull up material to it, and if you look at the attachments to his declaration, he pulled up actual articles that were available in the site. That was back in 1997. What's the size of the declaration? The first page of the declaration is 980. The declaration files behind that are the articles. But in addition to that, Lindsay Marshall, starting in 1995, up until 1995 it was a subscription service. You had to pay to be part of the Risk Digest group. In 1995, Lindsay Marshall took it and put it out to the public at no charge. So it didn't cost anything for the public to access it, to contribute to the site, and to be an active participant in the site. Peter Newman actually ran the site, and he would make decisions as to whether or not an article was worthy of being on the site. So it wasn't that anybody could post to it. You had to get past Peter Newman in order to put your material on the site. The unrebutted testimony is that it was text search available starting on September 20 of 1995. So at that point, if you stuck in voting or something like that, the Benson article would have popped up. From January 1995 to date, it was available for a fee without a subscription. Thousands of users have visited it per year since then, and over 100 electronic voting machine articles have been written and published on the site from the beginning of the site until 1999. And so what you have here is you have a group of people interested in electronic voting, interested in the risks of using computers for these kinds of functions. In other words, it's the place to go. It's the place to go. It's where the people hang out that are in the game. Roy Saltman was there. Rebecca Merker was there. A lot of the leading minds at that time exchanged ideas there. And so when you look at Klopfenstein, where a presentation of the information to the people who were in the know was two and a half days at one conference and a half a day at another conference on a poster board, that was sufficient longevity in terms of the presentation. It was sufficient publication to the group of interest to be found a publication. Here, it wasn't just presented to the group. It was the discussion of the group. And so you had this article embedded in the public, and I submit that we should not withdraw that from the public because it was not only accessible under the traditional analysis, it was accessible in the context of explanation to the people who were in the group. What about infringement of the system claims? Claims 1 and 25, Your Honor? The problem with using the human being as the ballot scanning means is that the claim also requires software to compare the scan to the electronic data that's stored for the person who voted, and connection means to connect that ballot scanning means to the computer. Well, if the human is the ballot scanning means, there's no software in our system that connects to the human to compare the human scan to what the computer stored as the vote of the person voting. You wouldn't call our genes our software? No, no. And so... That's another case. So I submit that for that reason, the system claim can't be infringed because we don't have any software that does that comparison. Even if a human could be the ballot scanning means, there's no software. Are there some accused devices, as counsel said, that have machines rather than just humans? There's three accused devices. The AccuVote and the iVotronic, those do not. The third one is the AutoMark. The way the AutoMark works is you walk up to the machine, and this is in the Declaration of Steve Bolton, you walk up to the machine, you vote electronically, and when you're done voting, you hit Done Voting, it prints a ballot for you that corresponds to how you voted electronically. It prints it out the back. While it's printing it out the back, the screen goes blank. You then get the paper ballot that's been filled out for you, and you look at it and say, is this how I want to vote? Is that the ballot scanning means, the person? No, that person I don't believe is a ballot scanning means because I don't believe a human is a human. No, but so this... The AutoMark has one further feature, and that is that the person looks at it and can read it. If for some reason they're handicapped or impaired, they can slide the ballot back into the machine. The machine will read the ballot and play it back through earphones so they can hear how they voted. But what the machine will not do is compare that scan of the ballot to a previously stored electronic record of how the person voted, and that's what the claim requires, and it does not do that. All it will do, the scanning feature is limited to scanning it to read back how the machine is interpreting your ballot. It will not compare it to anything, and so there's no software to compare it to how you vote electronically. How you vote electronically is erased from the memory at the time it prints the ballot, so it's physically impossible to perform that comparison. So there can't be any infringement of Claims 125. We get to Claim 49. I believe Benson invalidates 49. We get to Claim 85, and that's a subset of Claim 49. It's identical to Claim 49, except it's missing element 49E, which is the element that requires the inputting of information as to the acceptability of a printed ballot by the voter. So 85 doesn't require that step. It does require the rest of the steps of 49, and so it should be invalid for the same reason under Benson. And then Claim 93 is very similar, although it's slightly different, a little different wording, but the same subject matter, I submit. And it adds the further steps in Claim 93, requiring actual tabulation of the acceptable recorded and accessible printed votes. So you have to actually tabulate. You can't just stop at submitting for tabulation. And so that, of course, in Benson, it was a computerized voting machine. You obviously tabulate the vote with a computerized voting machine. That would be at least an obvious use of a computerized voting machine, and so we submit that 93 should be invalid as well. Claim 56 was found not infringed. He did not appeal that. Claim 94 was found invalid under Section 112, Paragraph 2. He did not appeal that either, and so we believe those should just rest. You mean he didn't appeal enough issues? He stopped at 14, right? Talk about the default a little bit, if you will. On the default, I am not aware of any fact, evidence, or circumstance of any improper behavior by anybody in this case with respect to that. None at all. Raise my right hand, I swear to it. What happened is we represented Diebold, my firm represented, I represented Diebold in a prior lawsuit. They sold off the premier division. Prior lawsuit involving? This was a lawsuit involving Avante. It was at different parties, nothing to do with this lawsuit. No relation. And so we represented them in that case. They were sued in this case. As they were sued in this case, they had just gotten done selling off the premier subsidiary to ES&S, and the in-house attorneys were talking to each other about how we were going to handle this lawsuit. Jeff at Amcheck submitted his declaration where he said he thought that when they signed up their local council, a gentleman from Pensacola, that they were going to get the extension for him as well. He found out that didn't happen through his own inadvertence, and immediately when we figured that out, they called me up and said, will you represent us there? I did not represent them at that time. My firm was not the one that actually picked up the fact that the motion for default has been filed. They had an outside attorney in Ohio who is their general, does general work for them, who saw they had been defaulted, called the people who were in the middle of the sale and said, hey, a default was just entered against you, and that's when everybody went to the fire drill and said, oh my God, what's going on? That's when they called me, and I called Jim LeSire, who I had never met before, and I said, Jim, what do we do? And he said, let's get an answer on file. Well, I called Mr. Provatola first and said, could we get a 30-day extension like the other people? And he said no, but we were in default, and that triggered a different situation. And so I said, really? And he said, really. I said, okay. And so then at that point, we were, we got our answer on file right away, and we were in the process of moving to say we'd like to file this two days at a time, and then the clerks, or Judge Falding, I think, I think she decided that it was moot because we'd filed an answer, and then Judge Fawcett said, wait a minute, you can't go that fast. And then Judge Fawcett treated it as if we were actually in default and made us show good cause, which I believe we showed. I think when you look at the six factors for default, that I think we were favorable in all of them, except, of course, the fact that we were in default. But we moved quickly. We have a meritorious defense. We, there was no, you know, usually with a situation like this, you say, well, what's the upside to you for having done what you did? There's absolutely no motive for going in default. There's no upside to a party for putting themselves in default. And so that's where we are there. Can you address quickly your opponent's arguments concerning the discovery, in this case, especially the quick pee process? Yes. The way that happened is his original discovery request reached over a million documents. And as we understood it, we had to get a protective order, I'm sorry, a privilege log put together for all the documents in the million that were privileged. And so we started doing that privilege log, and it was about 10 or 15 pages long, and there was no way we were going to finish. And we said, you know, what do you really want? We'll get you what we can get you. Can you narrow it down? And he said what he wanted us to do was categorize each of the million documents into categories so he could figure out which categories he wanted to look at. Well, that would have been a one- or two-month exercise as well, and we told him that. And we said, look, a lot of the stuff that you want is sitting on pallets and is not going to be helpful to you. Can we narrow the request? And we were never able to work out words that we could use to narrow the request. And so we were left in a situation where he wanted to back off the million documents, and so we found in the rules, Rule 26, where you can do the quick pee procedure, which allows him unfettered access. And Judge Baldwin, I believe, ordered us within eight days of her order to start turning over documents, and we were prepared to do that. And we had people on hand who were available to show him, here's what we have, here's where it is, you know, have at it, because there was a lot of information. We estimated the amount of time in terms of days we thought it would take him to sort of get through it. And as I understood the order, the quick pee simply was a first step to let us know what he had. And at that point, if he wanted to challenge confidentiality or challenge privilege or challenge anything else, he wasn't waiving any of those rights. We were using the quick pee simply as a means of getting through the million documents he had requested to get this government moving. We did, Diebold had some electronic information they were able to identify that met some of his requests, and we sent him a disk with about 3,000 documents on it because we could do that. But with respect to everything else, the request was so voluminous, there was no way to say, you know, if we do this, we're not going to have to repeat it again for this, or if we do this, we're going to be moving the ball forward. So since we couldn't figure out a way to put anything out there for him, we went to the court, and the court, I think, you know, she didn't give us everything we asked for. She didn't give him what he asked for. It was sort of a splitting the situation, a discovery dispute, and I think nobody abused their discretion and entered the rulings they entered. Well, we will save the remainder for you to the extent that you need it, on your cross-appeal only. Thank you, Your Honor. Mr. Probatola has some time. I don't know how much time I have left. Four and a half minutes. 428. That'll be sufficient. Excuse me, Your Honor. Oh, yes, I'm sorry. Thank you for... I had no idea how many documents, until they said they have millions of documents, and they wouldn't categorize them or even tell me what they were in response to our request to produce. No response whatsoever, except just objections. They wouldn't perform any investigation in terms of what do you have and in what form does it exist, so I can, you know, decide. I can save you some time, if that is the case. They wouldn't do it. So, notwithstanding the testimony of Mr. Evans, all these things that are supposedly... It was argument, not testimony. Yes, Your Honor, you're correct. Even though he raised his right hand. Yeah, I thought he was getting there, but I guess he didn't. The business about what happened between various counsel at the time, internally in Diebold, is something that is news to me, and why didn't that find its way into some affidavits? I saw some affidavits on this. Foucault did an affidavit. There were affidavits about communications. Yes, they were, and they were amazingly vague. They said things that said nothing. They didn't commit to anything, any kind of actual knowledge as to who knew what, when, or anything of that sort. I mean, Mr. Provotoli, you sound like you're taking such a vuncular approach to this whole thing. When you got a phone call saying, there's a default that took place less than two days ago, and I'm going to be representing these folks, will you set it aside and give me 30 days? Why did you say no? No, I said, number one, I have moved for a default. A default hadn't been entered. As a matter of fact, the magistrate refused to enter a default, waited until they filed this paper out of time, and then said my motion for default was moot. Well, the point is, before that happened, Mr. Evans did in fact call me and ask me to play ball. That's what his words were. Why was the district court decided this issue? Yes, Your Honor. The standard of review for us is abuse of discretion. Yes. Yes, wouldn't allow me to present any evidence, wouldn't allow me to take any depositions of the other side. You know, clear abuse of discretion in the sense of violation of due process. Now, I don't know how the federal system works in that detail, but I think that right there is sort of like working grounds for... Is there another issue you want to respond to? Yes, there is. The million documents on pallets in the warehouse is not standard for production. You're not responding on validity and... Oh, you want me to zero in on that? It's your time. You've got a minute and 20 seconds left. I would think those are the key issues you want to hit. Well, the Wayback Machine that he refers to uses web crawlers. I said this in the briefs. In fact, I think they said it too. It's indiscriminate. It just gobbles, goes through the URLs number by number and ticks off everything that's on the web. Again, he speaks of the Risk Digest website. It is not the website. It is the Catalyst UK website that you have to actually be able to find it, and get into it, and then that is what had been indexed by Mr. Marshall. And how it had been indexed, he cannot tell you, you see. Again, with respect to the connection to the human being and the matter associated with the automark. The automark does, in fact, review and read the document and displays it on the machine as well. It displays it audibly and stores it in memory. And then it is the human being that would furnish the function of connection with the DRE machine or the machine that selection. The only other thing that I wanted to mention was that the prior consent or the prior representation by Mr... They represented... He didn't answer the question when you asked him. He represented Premier, as I understand, in the prior litigation. And Premier, at that time, was a subsidiary wholly owned and virtually dominated by Diebold. Diebold is the one who selected him and represented Diebold in that regard. Your time is up. Thank you very much, Your Honor. And Mr. Evans has nothing to respond to on the cross-appeal, so the case will be taken under advisement. Thank you, Your Honor.